Good morning, everyone. This is Judge Rovner, and I want to begin by apologizing for any inconvenience or any discomfort that might not being here may cause you. I'm also going to ask that you speak more loudly than usual, if at all possible. And if everyone is settled in, is everyone settled in? Yes. Thank you. We will begin. And case number one is Appeal 14-1430, Gray Schools v. Sylvia Mathews Burwell. And it's Mr. Nemeroff, correct? Correct, Your Honor. Oh, I hear you very clearly. Thank you, Mr. Nemeroff. I'll try my best. Thank you. Good morning, Your Honors, and may it please the Court, Patrick Nemeroff on behalf of appellants. This Court, the Sixth Circuit, and the D.C. Circuit have all rejected the same claims that claim spring here, that their religious exercise is impermissibly burdened by accommodations that allow them to choose not to provide contraceptive coverage to their employees and that instead generally require third parties to provide the contraceptive coverage in their place. As this Court stated in Notre Dame, at bottom plaintiff's objections are to the government's independent actions in mandating coverage, not to any action that they themselves are required to take. The Supreme Court's holding in Hobby Lobby strongly supports that conclusion. In that opinion, the Court described organizations that are eligible for accommodations as effectively exempt from the contraceptive coverage requirement. It noted that the accommodations respect plaintiff's religious beliefs while equally serving the government's interest in ensuring that women have seamless access to contraceptive coverage without cost sharing. Mr. Nemeroff, let me stop you please. If the plaintiff refused to provide the certification and contract with an insurer who agrees not to provide contraception coverage, would you be kind enough to take us through the steps that would happen then? They will be fined, correct? If I understand your question correctly, then I believe yes, they would be violating the mandate and they would not have taken advantage of the accommodations. Well, is there some mechanism by which the employees would receive contraception coverage nevertheless? Well, it depends, I suppose, on the circumstances. So as an initial matter, I should say that just simply as a practical matter, the plaintiffs would have to inform their insurer or their third-party administrator whether they would like contraceptive coverage to be included within the health coverage that they're providing. So in the sense that they need to do that anyway, then presumably they would have no objection to actually either self-certifying or notifying the government that they don't want that coverage provided at that point. The government could step in and require the insurer or the third-party administrator to provide the coverage to their employees. But doesn't that notification continue to connect it to the employer? No, Your Honor. This is the problem. If the employer still has a connection, I sort of look at it like an extension cord. You plug into the employer and then you go all these meanders way out. But if you unplug it, it disintegrates. And that's what I don't see how, whether it's a notice to HHS or it's the certification. Well, the very purpose of the accommodations is to unplug the cord under Your Honor's analysis. What does it accomplish then? It accomplishes that by, first, saying that the employer doesn't have to pay for the coverage and requiring the insurer or third-party administrator to segregate the funds. By requiring the insurer or third-party administrator to send out notices to the employees separate from the other notices for the employer's health plan, notifying the employees that the employer will not be providing coverage and that the insurer or third-party administrator will be doing it instead. It does it by allowing the employer to state their objection to providing contraceptive coverage generally to the world, to their employees specifically. All the while, the employer is indirectly but unequivocally supplying or providing the insurance. The contraceptive coverage. Respectfully, I don't think that's quite right, Your Honor. The employer is providing health coverage without contraceptive coverage and the government is independently requiring the insurer to provide it. As the Sixth Circuit said in Michigan Catholic Conference, contraceptive coverage is being provided to the employees despite the employer's objections, not because of those objections. That it's with the same contract. It's not with the same contract, Your Honor. Is there a separate contract? Well, it's being provided as a requirement under federal law. So it's not being provided subject to the contract between the employer and the insurer or third-party administrator. It's being required because there's an independent obligation under the regulations to provide that contraceptive coverage. What you're saying is you can't provide insurance without providing contraception. Well, no. The employers are doing just that. They're providing coverage without contraceptive coverage. The fact that the regulations require third parties to independently provide contraceptive coverage in no way changes the fact that employers are doing what they wish to do, which is provide health coverage without contraceptive coverage. And, in fact, it makes clear that what the plaintiffs are objecting to here is entirely third-party action. And that's exactly what RFRA does not allow plaintiffs to do. It does not give them a right to veto the benefits provided to their employees separately from their own health coverage. Yeah, but it's not a veto. But the third party cannot operate separately without these documents, either a notice or a certification. They can't just come in and offer insurance, which is all I would look at is the least restrictive alternatives. So I'd like to turn to the compelling interest in a moment. Yeah, go ahead. You go with your argument. Why don't I do that? And let me just say first, though, the fact that the insurers  step away and raise their hand and say, we don't want to provide the coverage, that can't be taken to be a substantial burden on the employers. Otherwise, you could never have an opt-out regime. As this court said in Notre Dame. Well, but because of ACCO, they're now unable to provide insurance that excludes the objectionable mandated coverage. In other words, the ACCO forces them to choose between providing insurance that complies with the mandate or ignoring their religious mission to their employees' health and not providing insurance at all. They can no longer provide insurance that conforms to their religious beliefs, right? No, Your Honor. That's exactly what the accommodations allow them to do. They allow them to provide health coverage that do not include contraceptive coverage. The fact that they then require third parties to independently provide contraceptive coverage in no way burdens plaintiff's religious exercise. Now, to turn to Judge Mannion's point about the RFRA compelling interest test, even if this court were to find that there were a substantial burden here, the accommodations would meet RFRA's compelling interest test, and that's clear from Hobby Lobby, where five justices acknowledged that these accommodations do serve a compelling interest, and four justices assumed it for the purposes of their opinion. And most recently, the D.C. Circuit in Priest for Life, in a comprehensive opinion, went through all of those compelling interests that are served here. First, the government's interest in providing comprehensive health protections to the public while filling gaps that are left by accommodating religious concerns is certainly a compelling interest. Second, there's a compelling interest... Forgive me. I've been thinking about this argument that you're making right now, and let me go through something with you. Assume that there are a number of religious schools that either provide lunch or contract with food vendors to supply lunch to their students. The schools consider it a religious duty to provide their students with a nutritious lunch. And assume that the government passes a law that requires that all school lunches include cheeseburgers on the menu. Are you with me so far? Sure. Okay. So, religious Jewish schools object. So the government offers an accommodation. The government says if a Jewish school certifies its objection, its food service vendors will have to provide the cheeseburgers at their own expense. The Jewish schools will not have to pay for the cheeseburgers, and they're added to the menu by operation of law. If a Jewish school wants to offer lunch, they either have to contract with a vendor who in turn is required to provide free cheeseburgers or a neutral third party will provide the cheeseburgers free of charge. Is there any problem under the RIFRA? Well, there well may be a problem in that circumstance, Your Honor, but for purposes of substantial burden analysis first, there's a key difference between this case and that, which is that here the accommodations in essence take the cheeseburger out of the school. The employers can still provide health coverage that doesn't include contraceptive coverage, and the contraceptive coverage is instead provided completely independently. So it's not the same as simply a different vendor providing cheeseburgers at the school. The cheeseburgers are provided outside of the school, somewhere separately. At a food trailer across the street. Exactly. But even putting aside the substantial burden analysis, it's also clear it's hard to imagine what compelling interest that cheeseburger requirement could serve. Here, by contrast, as already recognized in Hobby Lobby and by the D.C. Circuit and Police for Life, the accommodations serve a number of interrelated compelling interests, and there's a least restrictive alternative for doing that. And it's important in looking at that least restrictive alternative analysis to note that the Supreme Court emphasized in Hobby Lobby that the contraceptive coverage needs to be provided seamlessly to women in order to be effective, and that's because there's quite a bit of record evidence that where there are burdens to preventive services, those preventive services are not nearly as effective. When you're referring to record evidence, are you referring to the district court record here or to the rulemaking record? To the rulemaking record. It's in the Institute of Medicine report. It's also in the Federal Register notices. And there's also been substantial briefing on the issue. So the contraceptive coverage has to be provided seamlessly to women, and the Affordable Care Act operates within an employer-based health care system, and within that system the least restrictive way to provide contraceptive coverage has to be seamless. So the insurers or third-party administrators need to be able to provide it separately. I hope you're watching your white light because of course I cannot. It's not on yet. It's not on yet, and we may need a little more time on this case. Of course, whatever we need we are going to take here. Mr. Nemeroff, if I could take you back to follow up on Judge Rovner's very first question. What happens if the religious school invokes the accommodation and the insurer or the third-party administrator also says it has religious objections to providing the required coverage? Well, that, of course, that hasn't happened yet. Not yet. That has not happened. In those circumstances, I can't say exactly what the departments would do. In this case, it's notable that a number of the plaintiffs are using insurers like Kaiser Permanente or Blue Cross Blue Shield, so I don't think it's likely to happen. Well, it's not happening now, but it obviously could if there are insurance companies that are associated with religious institutions and churches. See, they're the administrators. That's the key. The payment is dubious. You can discount fees and things like that, but the administration of a TPA, that's the employer's contract with that TPA. And if the employer, I don't know who the best administrators are. Maybe they're just, as you point out, run-of-the-mill insurance companies, and they're stuck anyway. But what about something that's an administrator who is not affiliated but a good administrator to administrate the service? This is where, if that administrator objects, I don't think there's anything. I don't know. What's the government do about that? Well, as I said, I don't think this situation has come up. You think that's too hypothetical. At this point, I think it is too hypothetical. I mean, I would note it's not this case, but there are circumstances that involve church plans that are self-insured plans that have to meet certain requirements. Churches are exempt. Churches are exempt. Church plans are not subject to ERISA. So there are other circumstances that are not at issue in this case. They could be extended to a church school. Here we have Catholic Charities and a university and that sort of thing. You refer to compelling state interest or government interest, which, frankly, when you put it all together and you add in what the amicus is saying about all of these services, this is a Cadillac plan and very expensive, I would assume. And that's really what is the concern, and that these various religious entities really don't want any part of it. Now, when you say compelling state interest, there are so many women who are not included here, unemployed, companies with 50 or fewer employees, that however compelling it is, there are many millions who are not even affected here. And that's where I'm wondering just how compelling is it when it's in sort of a narrow group. In most of the group, there's no objection. Well, I'd like to answer your question. I noticed that my white light. No, go ahead. We're going to be on here a while. No, don't you worry. Okay. Well, as the D.C. Circuit recently noted in Priests for Life, the fact that there may be some exemptions to a statutory requirement doesn't mean that it doesn't serve a compelling interest. And here I can go through the ones that plaintiffs have specifically pointed to. But the first, of course, is the exemption for religious, for churches and houses of worship. And that's a longstanding traditional category that has been recognized a number of times. So I think it can't defeat the government's compelling interest under RFRA to provide greater respect to religious organizations. With respect to the, you mentioned the coverage of employers with less than 50 employees, there it's worth noting that if those employers do provide health care, they are required to comply with the contraceptive coverage requirement. That's right. A lot of them are uninsured. Right. And if they don't, their employees are subject to the individual requirements. Exactly. And if they don't, then the employees very well may be able to get subsidies on exchanges. It's also worth noting that, you know, for example, Title VII has an exception for employers with smaller numbers of employees. But no one would say that that means that Title VII doesn't serve a compelling interest. With respect to the question of expense, though, isn't the record pretty clear that health insurance without contraceptive coverage is more expensive for a group of people than health insurance with contraceptive coverage? That's why this accommodation works economically, right? That's exactly right, Your Honor, and that's why insurers are willing to step in and provide this contraceptive coverage without any compensation from the government because. The objections here have nothing to do with cost. They have to do with deep philosophical objections, faith-based objections to contraception. That's right. They certainly do not have to do with the cost of the coverage. Well, they sincerely held belief with these groups. It seems to be undisputed. I mean, we have to accept that, right? That's right, Your Honor. This is not something that's just a knee-jerk reaction. It's just deep-seated. And one can argue, say, well, yeah, a lot of them say that, but they don't practice that. That's not the point. The teaching and what they sincerely believe, sincerely held belief. And what happens when they encounter this, it seems that it's not the expense. What they're saying is, well, if we have this comprehensive service, what's really going to be avoided are babies, and babies are very expensive, and that's where the cost savings comes in, I guess. Isn't that the argument, that if you have really good contraception services, they say we're going to avoid abortions, but we'll put that on the side, that there are first going to be fewer babies, and babies are expensive for insurance. Well, there are a number of complications that are avoided by providing contraceptive coverage to women. There are a number of women who have various conditions that are contraindicated for pregnancy that can put their lives in danger. So it's not simply avoiding babies. Avoiding babies, it's whatever you don't want. For whatever reason, you don't want to be pregnant. That's what happens. And obviously, whether it's a threat, there's tests that give that say, well, the baby's going to have spina bifida or cystic fibrosis or something like that. As you probably know, 90% of all Down syndrome that are detected are aborted. So there are a lot of reasons maybe people don't want to get pregnant. I'm not denying that. It's just that that's where the biggest expense is. And it's an expensive process here. I know we're running out of time, but go ahead with your argument. Well, just to your point about the sincerely held beliefs with plaintiffs, as you said, that's not in dispute. But one thing I want to emphasize is that this court should not collapse the sincerely held belief analysis with the substantial burden analysis. There is a rule for this court. Or are they mutually exclusive? Well, certainly the belief bears on whether there's a burden, but there is a rule for this court to determine whether there is a substantial burden. And here, where the only thing the plaintiffs are required to do is identify themselves as objecting to this coverage and step aside and let a third party step in and provide that coverage in their stead, that simply cannot be a substantial burden. And that's a matter of whether that's the least restrictive means. That simply is a substantial burden analysis. But as I also explained, it certainly satisfies the least restrictive alternative analysis. The least restrictive. Exactly. Not less restrictive. Least restrictive. Which is what the courts have said so far. Well, of course, the court in Hobby Lobby had no reason to rule directly on the accommodations, but its analysis strongly indicates. Well, Kennedy sort of said that's an example of a less restrictive, I think. He wasn't endorsing it at this point, but looking ahead, maybe. But we don't know. Sure. And the D.C. Circuit subsequently, just a few weeks ago, did go through the analysis in quite a bit of detail and also found that this is the least restrictive alternative for serving a compelling interest. The D.C. Circuit, yeah. Yes. And they also said that there was no burden because all they did do is sign form. That's right. Which we know that isn't where we are. Right. That is not that the to say that all you have to do is sign a form. Therefore, there's no burden. I think Hobby Lobby overrode that. Well, that certainly wasn't the D.C. Circuit's reasoning. The D.C. Circuit's opinion did come after Hobby Lobby. Yeah. The D.C. Circuit. They discounted that, I guess. I don't I'm not sure what the D.C. Circuit where it stood on what the burden is. Mr. Nemeroff, if I could follow up on a couple of those matters. With respect to the smoke signals we got in Hobby Lobby about the accommodation, obviously the majority stopped short of a complete embrace that would resolve these cases. But we also had the Wheaton College order that came out later that same week. Is it correct that the final interim regulations now, in effect, track the Wheaton College order? That is, the Supreme Court thought it was sufficient to simply require the religious not-for-profits to state they're opting out their opposition to the government and that was good enough? That's right, Your Honor. So just as you pointed out, in Wheaton, what the Supreme Court said was that its order would not affect the ability of employees and students to obtain without cost the full range of contraceptive coverage and did not preclude the departments from relying on a notice from the employers to facilitate the provision. In other words, notify the employers and the insurers and TPAs. Exactly. Is that also consistent with the order that's in effect in the Little Sisters of the Poor case in the 10th Circuit issued by the Supreme Court? I think the two opinions are very similar when they contemplate notice to the government. Before you sit down, Judge Rover may have some other questions, but there's one other matter I'd like to follow up with you about. The plaintiffs in their brief tell us at page 23 and 24 that if we disagree with the district court in this case, we should leave the injunction in place while they pursue other theories in the district court. They didn't mention cert, but that would also obviously be a possibility. I'd be interested in the government's views in addition to the plaintiffs on those questions. Well, there are thousands of employees at issue here, and those employees are going without their contraceptive coverage at this point. I think we'd be loathe to accept further delay where there was no ruling. I think it would obviously be available to plaintiffs to seek emergency relief in those circumstances, so I don't know why it would be necessary for this court to provide some stay in the meantime or an injunction in the meantime. Well, the injunction is in place now. It has been for some time, essentially all through 2014. That's right, Your Honor. Okay. And in terms of when the status quo might change, if it does, it's hard to see a day-to-day emergency here. That's right. I suppose... You all didn't pursue this appeal on an emergency basis. No, that's correct, Your Honor. And I think if the court wanted to give plaintiffs some period of time to seek another preliminary injunction, that might be reasonable, but we would emphasize that there are real interests at issue here, and so we don't think there should be a preliminary injunction without any, you know, finding that they've actually satisfied the factors required, including likelihood of the merits on those other claims. I assume the notification under the Wheaton case, the notification described in paragraph whatever it says, C1 of this section, I'm sure there's some details in there in that notification, but without that notification, the service can't go forward. Well, the government needs to be told who wants to opt out in order for the government to stop it. Well, I want out, but I want someone else to do it. But that's basically where I'm just having a problem. There's no disconnect, really. I think I use this extension court because it has to stay plugged into the employer. It has to, either with a notice or a certification or something before the, I don't know, the government can intervene, but the government can supplement. But, you know, that's just my problem. Well, just to that point, you know, taking a step back, the Affordable Care Act, of course, operates within the employer-based health care system, and there certainly isn't any requirement in RFRA for the government to replace that entire system. The government can do it. Under the employer-based health care system, there were advocates for a single-payer system. You could socialize the entire system, including providers. That's an alternative, too, right? I don't think you can read RFRA to require that sort of action on the part of the government, and within the employer-based system, any employer is always going to be able to say that they're somehow related to the health care that's being provided to their employees. But ultimately, RFRA does not give employers the ability to veto their employees' access to this coverage. And here, the accommodations allow the employers to step aside, say, we're not providing the coverage, and others will step in and do so. Now, even if the court does still think there may be a substantial burden here, as we've already discussed, it certainly meets RFRA's compelling interest test. It certainly meets what? It meets RFRA's compelling interest test. Given the fact that we really don't have a district court record on that point, you have to rely for that evidence on the rulemaking record. Is that right? Sorry, on which point? On whether this is the least restrictive means. Well, the district court did address the question on the merits. It did analyze it. I think there's certainly quite a bit of discussion in our briefs, and there's quite a bit of evidence in the Institute of Medicine report and other work. I'll signal to Judge Rovner that I have no further questions at this point. Thank you so much. Thank you very much, Mr. Nemeroff. And I would very much appreciate Mr. Karras and Mr. Baylor each being given another five minutes. Thank you, Your Honor. Thank you. Good morning. I'd like to start with- Who are you first? I want to know which one. I'm sorry. Oh, I'm Matt Karras. And you represent? I represent the Indiana and Illinois Catholic entities, the Diocese of Fort Wayne-South Bend, Catholic Charities, St. Anne's Home, Franciscan Alliance, which is a hospital system, Specialty Physicians of Illinois, and the University of St. Francis, and Our Sunday Visitor, which is a publishing company. Okay. Well, that took up your five minutes. I'd like to start with the government's dealing with the substantial burden analysis and the role of the court. The government asks what Solicitor Verrilli asked the Supreme Court to do at oral argument in the Hobby Lobby case, which is engage in a proximate cause analysis to judge whether the law here actually makes plaintiffs complicit or not. And Hobby Lobby answered that question. Justice Alito answered it at oral argument, and he did it in his opinion on behalf of the majority of the court, saying that if plaintiffs believe that the act demanded is connected in a way that is sufficient to make it immoral, that's the end of the question. That is a philosophical and religious question, and the courts may not arrogate to themselves the authority to provide an answer. What happens if Hobby Lobby's owners decide they agree with your client's analysis, and the accommodation that got such praise in Hobby Lobby is the target of the objection? If the Hobby Lobby owners decided the accommodation was okay with them... Was not sufficient? Was not sufficient. If they agreed with your client's analysis of the moral or religious issues? Well, right, the same analysis applies. The Hobby Lobby court said it is up for the religious claimant to make that religious determination. In Hobby Lobby, there was no objection to the accommodation. They objected to paying for the services here. The religious exercise articulated is very different. The religious exercise here is simply the act of offering insurance. The plaintiffs here morally cannot offer insurance and enter the insurance markets with a third party that provides objectionable coverage. The government recently issued interim final rules in response to the Supreme Court's opinion in Hobby Lobby, and also in response to the Supreme Court's interim order in the Wheaton College case. Do the plaintiffs still have an objection to the process under those interim final rules? Yes, they absolutely do. The Wheaton College case, that injunction was based on this notice provision. Again, here, these plaintiffs object to entering the insurance market. The plug that was referred to in the extension court is plugged in at the moment they decide to offer insurance. And just like the cheeseburger analysis, if they provide a hot lunch program, cheeseburgers are provided. Here, when these plaintiffs choose to enter the insurance market, which this mandate poisons, that is, if you choose to provide insurance, your beneficiaries are going to get the objectionable coverage by virtue of your decision to provide insurance, that these plaintiffs have determined morally raises complicity problems. Mr. Karras, could we affirm here without creating a circuit split? Yeah, what effect does Priests for Life, for instance, have on your argument? Well, in Priests for Life, the D.C. Circuit determined that there was no substantial burden. Judge Pillard stated... My question was, can we affirm, we're all familiar with the opinion, can we affirm without creating a circuit split? No, I do not believe so, because of Judge Pillard's determination that there was no substantial burden. Here, to affirm would be to affirm the lower court's determination that there was a substantial burden. So that would be at odds with the D.C. Circuit Court opinion. So what are we to make of the Hobby Lobby Court's praise for this accommodation, and the Wheaton College and Little Sisters of the Poor orders saying, you don't have to notify your insurers, but it's sufficient, apparently, as far as the Supreme Court is concerned, for you simply to raise your hand, register your objection with the government? Well, with respect to the Hobby Lobby Courts dealing with the accommodation, it certainly didn't rule on the issue, and in particular with respect to Justice Kennedy, when he referenced the accommodation, he said the accommodation here is permissible because the plaintiffs in these cases, the Hobby Lobby plaintiffs, don't object to the accommodation. They don't have a problem with just simply having the cost removed. Here, again, these plaintiffs' religious articulation is complicity caused by, first, entering the insurance market at all. They are fined if they don't enter the insurance market, and it is part of their religious expression to enter the insurance market, and once they do, the result is, in connection with their contractual relationship with their insurer or their TPA, that the services are provided. Isn't it actually just the fact of employment that imposes this burden? No, because they could employ and choose not to offer insurance, and they would be fined. They could, instead, with respect to self-insureds, simply not send any notices and be subject to the fines, because the other fine system is, we will fine you if you don't offer the objectionable coverage. So the notion of, if you don't send this self-certification or you don't send to the government, the third-party administrator doesn't have an independent obligation from the government to provide insurance, because the alternative is always, for these plaintiffs who could afford it, to pay the fines for not having a compliance plan. But that's not an alternative. It's not an alternative. I think that's an expression that the burden is huge. That's absolutely right. They would be fined out of existence, but my point is that's the way that this is structured. There isn't this global, everybody's going to get contraceptives no matter what. Do we know how the $2,000 per employee per year fine or tax, depending on what you want to call it, compares to the cost of providing coverage? No. No, Your Honor. That is not. Surely that's less than the cost of providing an employee with comprehensive health coverage. Right. It may be, it may not be. I don't know the answer to that factually, because it's not in the record, but the Hobby Lobby court noted, held specifically that where it's part of your religious expression to offer insurance, that the burden is still the same under RFRA. It doesn't say $2,000. I'd like to go back just for a second to your responses concerning priests for life, and I take it that your response would be the same about the Sixth Circuit's decision in Michigan Catholic Conference. Yes, it absolutely would. I would say that the Sixth Circuit's decision was pre-Hobby Lobby, where Hobby Lobby made clear that this notion of burden is simply to determine the degree of pressure once someone alleges that they are doing something that violates their beliefs. So I think analyzing the Sixth Circuit is a bit different because it was pre-Hobby Lobby, but the D.C. Circuit's decision post-Hobby Lobby, Judge Pillard in that decision said that she was going to analyze whether plaintiff's subjective understanding of the law is at odds with what the law actually requires. That is, to engage in this causation analysis of saying, does this law actually cause you to be complicit? Yeah, but any way we look at the two cases, we would have to create a circuit split with two of our sister circuits if we adopted your position, correct? Yes, Your Honor. Mr. Karas, I'm sure you remember your argument before this court in February in the Notre Dame case. I'd like to go back to a question I asked you in that argument concerning our country's long history of accommodation of different religious beliefs and traditions. That history includes, for example, providing for conscientious objectors to the draft. There are the Pledge of Allegiance cases, the public schools and the exceptions to mandatory attendance and so forth. Those are just a few. I asked you in that argument whether there are any cases where people claimed that the accommodation process itself imposed a substantial burden on religious faith and practice, since that's what's so novel about these cases. Right, and I thought about that after I left the courtroom, and I wish I would have said then, that I have always thought that the Thomas case was kind of one of those examples, because there you had a conscientious objector, and he was working in a munitions factory. He had an objection to that as well, because he didn't want to make steel for tourists. And so the government could say, look, we're not going to make you go to war. We're going to have you opt out by making tourists. And certainly the Supreme Court in Thomas said, if the conscientious objector believes that that opt-out provision, so to speak, doesn't wash his hands of the moral determination that is his sin, he still gets to make that case. Well, Thomas didn't involve the draft, right? He did not. Okay, but let's pursue that. Let's take the conscientious objector variation on that. You've linked them in your brief in footnote 17. Let's suppose the conscientious objector status is granted by draft board. And the draft board says, well, okay, we're going to assign you to alternative service. We've got, as you suggest, working in the tank factory. And he says, that's not too good. And then the draft board offers what was actually offered. Let's say you can do work as an orderly in a veterans hospital or work at a national park or something of that sort. And suppose that conscientious objector says, no, I'd still be doing work for the corrupt federal government that is pursuing this immoral war in pick a country. That would burden my religious beliefs as well. And the alternative is jail. Therefore, there's a substantial burden on my sincere religious belief. I'm out of here. Is that right? Yes. You think RFRA means that the government must excuse somebody from service entirely? No, I don't think that RFRA means someone must excuse because RFRA means you would then go to the strict scrutiny analysis. And as the Hobby Lobby decision said in looking at kind of the tax code example, which is fairly similar, if there is a compelling interest, and there clearly would be at some point, we have to, you know, Certainly not with what happens with one conscientious objector or one taxpayer. Well, no, but in that example, the government would articulate that just as it does with the social security system and the tax system, that we need to have this uniform ability that if one person comes in and destroys it, it'll destroy the whole thing. That type of argument has not been made in these cases with respect to the contraceptive mandate because, of course, they're already grandfathering millions of people, and there are plenty of folks. Well, there are plenty of exceptions to the draft and to the tax code and to the social security system, right? Right, there is, but that is still the analysis that would be undertaken. You take that example, you look at what the interest is, you look at whether there's a least restrictive means or not, and I'm just suggesting that in the draft analysis that I think the government would have some pretty compelling arguments. But you think it would be subject to the strict scrutiny test? I think it would. With respect to the substantial burden, it would. I know my white light is on. I'm not sure if that was the 15 minutes or not. As far as this conscientious objector thing, you know, you're talking about one person. Back in the draft time, when I came back from Vietnam, I had to join the reserves, and I was surrounded by draft dodgers. They had a way of getting around, I don't know whether they were conscientious objectors or not, but that seems to be a very narrow thing. We're talking about a much broader aspect, and that's why I'm not really comfortable with that analogy. But I guess if you really want to put it down just to one person, I guess you can't just not work. If he's a conscientious objector, I guess they're going to throw him in jail. I don't know whether that's the case or not. It's obviously obsolete because you have a voluntary military. Right, and I think in this case, when you try to undertake that analysis, you have to look at these particular plaintiffs. You have to look at the employees of Catholic Charities of Fort Wayne South Bend and how this applies to them and whether this mechanism under the strict scrutiny analysis of doing it through the existing employer plans, which is an extension court, right? This is enforced by the Department of Labor. It is part of the employee relationship, and it certainly only occurs once these plaintiffs decide to offer insurance or, as Justice Sotomayor said in the Wheaton dissent, a but-for cause of sending this notice to the government or signing the self-certification. Okay. Thank you. May it please the Court, my name is Greg Baylor, and I'm here on behalf of Grace Schools and Biola University. Your Honors, there are approximately 350,000 religious congregations in the United States. The government has categorically exempted all of them from the HHS mandate on the stated rationale that these employers are more likely than others to employ people who share their religious convictions. Well, that perfectly describes Grace and Biola, who draw their workforces from among those who share their religious beliefs, including their religious beliefs about the use of abortifacients. But despite this, despite the fact that these schools fit the stated rationale for the religious exemption, the government has persistently withheld that exemption from them. We submit that RFRA requires the exemption that the government has withheld. I would like to explore what level of entanglement is problematic to the plaintiffs. I understand the argument that they feel a religious need, and I understand how strongly that is felt. Indeed, I do. To provide insurance to their employees and under the RFRA, they cannot provide insurance that does not also include objectionable products, albeit paid for by someone else. If they file the certification, can the government then provide a contraceptive coverage through some other insurer? Or if the government directly supplied the benefit, would that be problematic? In other words, is the problem that the contraception coverage is coming from the plaintiff's own insurers and administrators? And what if it came from an unrelated third party? Would that be an adequate accommodation? Well, I think it would be adequate from the plaintiff's moral perspective if the entitlement to the objectionable drugs did not turn on the employer's decision to provide insurance and the employee's participation in the employee's plan. And I'm not sure from your hypothetical whether the entitlement rests on that or whether it's just the government decides it's going to set up a program under which anyone who doesn't have objectionable abortifacients through their employer plan, that they can go and get that from the government. I don't think my clients would object on moral grounds to that. I don't think they would say they're complicit. That would be a least restrictive means, wouldn't it? That would be a less restrictive means. Couldn't somebody else object? I suppose that somebody else might object on that. The level of entanglement, somebody could pick any level of entanglement, including paying taxes. That's too much, right? Well, I think it would be difficult for the plaintiff, the claimant in that circumstance, to credibly assert the factual foundation for the claim that they're complicit. Taxpayers, we've got a long history. Go back to the Vietnam War in terms of taxpayer conscientious objection, right? Right. It's sincere? It's sincere, it's a burden, the threat is prison? Yes. And the court has dealt with that taxpayer scenario not by saying that there's no substantial burden, but there's a compelling interest. That's how the court dealt with the case in the United States versus Lee. But these plaintiffs have said it would be acceptable to them morally and obviously not a substantial burden legally if, for example, the beneficiaries of their plan could take advantage of, say, the Title X family planning program that the government already provides. The government has 4.7 million clients a year are served by 4,200 family planning clinics under Title X of the Public Health Service Act, and the government brags on its website about the effectiveness of that process or that program in preventing unintended pregnancies. Well, that's clearly a separate source. If the government funds these directly, if government pays for it, which gets back to what I was talking about is about this compelling interest, it's compelling but misses so many people. And if the government has a way of paying directly, similar to a SNAP card or like they use for food stamps, something that gives that individual who wants contraception, regardless of where she works, that could then get a direct funding or permit for it. That seems to bypass whatever objection you would have. Right, and that would certainly be a less restrictive means for the government to accomplish its objective. They presented no evidence that that would be unworkable. That's exactly how they could do it and they should do it. The government, I'm... The rulemaking record is pretty clear about the value of the so-called seamless coverage, right? It is not clear about that. There are nine pages in the Institute of Medicine report that deal with the contraceptive mandate. And, again, recall that my clients object only to four out of 20 things, and those 20 things are one out of eight categories in women's preventive health service and there are 143 items overall required by the preventive health services mandate. So my clients object to very little and a large number of those things that are recommended, required under the statutory preventive service mandate are specifically designed for women. So the scope of our objection is fairly narrow. Yours is fairly narrow, but the principles you're arguing for would allow a challenge to anything, right? I suppose they would, but the seamlessness argument is not supported by the Institute of Medicine report. The only sentence in there that even arguably supports that notion is the idea that in some circumstances, such as with respect to mammograms, small reductions in cost sharing will increase use of mammograms. So that's a pretty slender read on to rest this entire notion that seamlessness is a compelling interest. Let's look at it from this perspective as well. Twenty-six states have state contraceptive mandates. Have those worked? Have they reduced unintended pregnancies in those states? They have not. The rate of unintended pregnancy in those states is actually higher than the states without contraceptive mandates. So I fear that this mandate, the only thing it accomplishes when it's applied to entities like Grace and Biola, is to violate their religious convictions without advancing the government's stated interests. I'm going to take you, I don't know if you'll be able to answer this, but is there an insurance company in America that doesn't provide contraceptive coverage to some beneficiaries? Well, the plaintiff's insurers did not do so prior to the mandate. They're talking to the microphone. I'm sorry. I'm talking to the speaker, Judge. She's right there. I wish you were speaking to me. And it doesn't help that I have a bad case of laryngitis. I'm doing it again, right? I hear you perfectly. If you could repeat your question. Well, I guess I was wondering, you see, here's what my thought was. One of the plaintiff's religious objections is that it requires maintaining a contractual relationship with third-party insurance companies that are authorized to provide contraceptive coverage to the enrolled beneficiaries. And it seems to me that that probably was true before the Act was because I've been wondering, is there an insurance company that does not provide contraceptive coverage to some beneficiaries? Well, again, these plaintiffs, well, Biola has an insured plan, and its insurer was willing to sell Biola a plan that excluded contraceptives. That changed, obviously, with the mandate. That's not the question. That's not my question. What I'm wondering is, and as I say, you may not know the answer, but is there an insurance company that does not provide contraceptive coverage to some beneficiaries if they wish it? Okay. The question is whether there's an insurance company out there that has a moral objection, and therefore the answer to that question is yes. There is a church plan provider called Guidestone. It's a Southern Baptist-associated entity that objects to providing, to sort of being the mechanism through which separate payments for abortifacients are made, and it has obtained an injunction from, I believe the court is in the Western District of Oklahoma. So, yes, that does exist. Tell me this. Do the plaintiffs, would the plaintiffs refuse to contract with insurance companies that provide contraceptive coverage to any beneficiaries? Well, they've not been presented with that moral question, and I can only speculate about what their complicity analysis would be. My guess is that they would conclude that they're not complicit in that. They're only complicit about when their decision to offer insurance creates a new entitlement to abortifacients to their employees as a consequence of their participation in the plan. Thank you. Are you done? Oh, I was just waiting for more questions. I think it bears reminding the court that the government conceded that it cannot satisfy the compelling interest standard because of this court's prior decision in Quartet, and its effort to sort of get out from under that and suggest that Hobby Lobby somehow changed the analysis of compelling interest is not persuasive. Everybody's dealing with a changing landscape here. Right, but it bears noting that Justice Kennedy joined in full the majority opinion, which not only said we're not going to decide the compelling interest test, but also cast serious doubt upon the government's assertions about compelling interest. He said, they all said, all five justices in the majority said, hey, the government has articulated its interests at a very high level of generality, and that just doesn't cut it under the government's obligations under RFRA, particularly as interpreted by the Supreme Court's decision in the Ossentro decision. In that case, the court said, let's look at whether it's a compelling interest, not in general, not in the abstract, but as applied to this particular claimant. Well, let's talk about this claimant. As I started out by saying, they are exactly like the plaintiffs, the claimants, the entities that are categorically exempt from the mandate because they hire people who share their religious convictions. We have a stack of declarations that were filed in the district court from female employees of these two schools saying, we don't want this stuff. We object to this. We share our employers' religious convictions. And the government's asserted compellingness in making abortifacients available to everyone is hard to take seriously when they've done absolutely nothing for all the employees who work for the 350,000 religious congregations in the United States, many of which don't necessarily share their employers' religious beliefs. Are you saying that none of the plaintiffs' employees want to take advantage of this coverage? The record evidence in this case says that these schools hire only people who share their religious beliefs, including their beliefs about abortifacients. That's not my question. The factual question about whether there's a single employee who works for either one of these schools that wants free abortifacients, I suspect that there is. I mean, given the numbers of people at issue here, you've got to imagine that there's at least one. Given the rate of use of contraceptives? Well, again, their objection is not to contraceptives. They're happy to provide for hormonal contraceptives. But yours may not. Other employers may object to all. To be sure. I mean, they're talking about plan B, which most women never use. Some women use once or twice in a lifetime. It costs $55 a box. But the objection is to creating that new access to those abortifacient drugs. That's their moral objection. Whether or not an individual takes advantage of it or not is not relevant to their moral analysis. They don't want to create the permission slip. They don't want to create the access. But it really puts the lie to the government's claim that, oh, we absolutely must make free abortifacients available to the employees of Grace and Biola when they're all pro-life Christians who have said that they share the school's religious beliefs and don't want to use these things, combined with the government's utter neglect of the people who work for religious employers who are categorically exempt. It's utter neglect. So should the government respond to that by imposing the requirement on everybody? Well, that would be one way they could deal with it. That was the first proposal, right? And then they backed off and created the exception for churches, and then backed off further and created the accommodation for not-for-profits, right? Well, with respect, the religious exemption existed right from the beginning. So it was right there. And, again, their stated rationale was because we think, by the way, without any evidence whatsoever, and their 30B6 deponent in a different case said, yeah, we just basically made that up. We have no evidentiary basis for assuming that churches and integrated auxiliaries are the only ones that hire only co-religionists and no other religious organizations does. But, yeah, that exemption existed right from the beginning. Our point is, why didn't the government exempt Grace and Viola and entities like it when we share a characteristic that symbolized the religious exemption? How should they have written the regulations? They should have said that any entity that has a sincere religious objection to complying with the mandate should be exempt. Including, let's say, a publicly held for-profit company? I suppose so. I'm not representing one of those. I mean, obviously Hobby Lobby dealt with this issue to some extent, and they limited the holding. Well, they dealt with the fact that- But they said the accommodation should be sufficient. No, they did not say that the accommodation was sufficient. They said it's a less restrictive means than the one that the government had offered to Hobby Lobby, which was compliance. It didn't say the accommodation doesn't impose a substantial burden, nor did it say that the accommodation is the least restrictive means. I mean, three days later, the court said clearly that the accommodation was not the least restrictive means. But the only change, though, was to say just notify the government in Wheaton College. Right. And that change obviously hasn't changed- That satisfied the court in Wheaton College on a preliminary interim basis. Well, it gave Wheaton what it asked for. I mean, Wheaton said that compliance with the accommodation substantially burdened its religious exercise, and the court agreed. It said just notify the government. Right. And then the government would follow through with what is now provided under the final interim regs. Well, but under the Wheaton College order, the court took ERISA as it then stood, and there was an understanding that only the plan sponsor can designate the TPA as the plan administrator and as the plan fiduciary. That's what the government believed. That's why it required the self-certification in the first place, because it knew as a matter of ERISA law that it had to get the plan sponsor to send that thing. Apparently they changed their mind completely about what ERISA permits them to do and what not to do, and it bears noting that Wheaton College itself now objects to how the government has exploited and used that notice contrary to law. So we're not satisfied with interim final regulations. If we were, I guess we wouldn't be here. Thank you so very much. Excuse me. I had one more- Oh, of course. Just one more observation here. Of course. Whatever. What you were describing here as far as the compelling state interest, it seems that if given your clients that they generally maybe really try to hire only people who share that sincere belief, but we're broader than that. Notre Dame, for example, has plenty of people who don't share that belief, and yet that is the institution's sincere belief. I think that's one of the things we've got to look at here. That's certainly an institutional thing, regardless if everybody is complicit with it. Right. No, I agree. It seems to me, I keep going back to this as far as the least restrictive means, because it all seems to be they're trying to disassociate. It seems the simplest solution, you mentioned many of other government programs, and I'm sure Medicaid and some others come in as well, that the simplest solution is for those women who want this Cadillac plan, which is what described if I put everybody together, this has a lot of things in it that are free, that it would be for the government to have a direct payment, and that's the simplest way to bypass these really seriously and held religious beliefs. I'm just looking at it from combining compelling state interest and the least restrictive means. I completely agree, and it bears noting that the government bears the burden on least restrictive means. It hasn't carried that burden. It hasn't attempted to carry that burden. It rests its entire seamlessness argument on one sentence in the IOM, or two sentences in the IOM report about how cost sharing can affect use. That's not enough of a basis. That's not what Ocentra requires. That's not what Hobby Lobby requires in terms of the government's burden in proving least restrictive means. There are less restrictive means than this accommodation, than this alternative compliance method. The government really insists on putting a board of patients in the hands of employees of pro-life Christian colleges that can pursue it some other way. Thank you very much. And Mr. Nemiroff? Yes, Your Honor, thank you. I just have a few brief points, and then I'm, of course, happy to take any questions. But I'd like to focus specifically on the Supreme Court's holding in Hobby Lobby and the implications of that holding for this case. And to start where my opposing counsel just left off with the compelling interest task, the Supreme Court emphasized in its opinion over and over again that the effect of these accommodations on women would be precisely zero, that they would continue to face minimal logistical and administrative obstacles, that it would equally serve the government's interests as well as the mandate. And so the court made clear that in satisfying the compelling interest task and in finding a least restrictive alternative, that alternative needs to provide this seamless access to contraceptive coverage. And the court also made clear, and Justice Kennedy stated this in his concurrence, that the government is not required to set up an entire new program in order to satisfy that least restrictive alternative task. So you say seamless. That means, I don't use the word inextricably intertwined, but seamless meaning it's not separate from the employer. It is separate from the employer, but it's not separate from the insurer from which the employee gets their coverage. So the employee does not have to go out, face some additional administrative burden, go to some separate clinic. They can still get contraceptive coverage from their doctor using insurance in the same way, and that is important for preventive services. The Supreme Court emphasized that point. And to take up one example that specifically came up in this argument, just one example, the number of so-called alternatives that plaintiffs have proposed simply don't work. Title X, Title X, for example, is a program where the women would have to go to some separate clinic. In addition, Title X only provides cost-free services to individuals below a certain poverty line. So that program is not simply, as they would suggest, readily available for this, and it would not be seamless access. This doesn't either. This is a relatively small number of people that aren't getting, or at least challenging it, versus all the people who, the women who are either unemployed or underemployed or part-time and all kinds of other things where they're still out there without this, whatever you call, a seamless compelling interest. I recognize there's only so much you can do here, but this is what's targeted. I think when it's compelling, if it's really that compelling, it seems that, I don't know about the ACA, a lot of people didn't read that one, I don't know what's in there, but at least it's not so overwhelming that they can't separately come up with a solution for what this compelling state interest is. Well, Congress reasonably worked within the employer-based health care system with the Affordable Care Act, and it's worth noting that in this case alone, there are approximately 20,000 employees of these plaintiffs. So there are quite a number of women who would be implicated by this injunction by not allowing these plaintiffs to opt out and allowing insurers and third-party administrators to step in. Now, I also want to address briefly, my opposing counsel suggested that Hobby Lobby answers the substantial burden analysis. In this case, essentially suggested that under Hobby Lobby, the substantial burden analysis and the sincerity of belief analysis is collapsed together, but that's simply not true. In Hobby Lobby, the court dealt with for-profit plaintiffs who were subject to the mandate and did not have this accommodation available to them. So the court did not discuss whether or not an opt-out system can impose a substantial burden. And as this court stated in Notre Dame, the novelty of that assertion is really striking. The idea that opting out of a requirement so that a third party can step in and fill your shoes is a substantial burden would subject any time the government wants to accommodate religious beliefs and fill the gaps, it would subject that interest to the compelling interest test, and we simply don't think RFRA can be read in that light. If there are no further questions, thank you. Well, I would like to thank all of you, Mr. Nemeroff, Mr. Karras, Mr. Bailiff, for a very well-argued case, and thank you. The case, of course, will be taken under review.